[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10732

_____

CURTIS BAKER,

Plaintiff-Appellant,

*versus*

CITY OF MADISON, ALABAMA,
DANIEL NUNEZ,
DION HOSE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 5:21-cv-00382-LCB

_____

Before JILL PRYOR, GRANT, and HULL, Circuit Judges.

HULL, Circuit Judge:

In this 42 U.S.C. § 1983 action, plaintiff Curtis Baker alleged (1) Officer Daniel Nunez used excessive force when Officer Nunez tased him at the scene of an automobile wreck, (2) Officer Dion Hose failed to intervene to prevent Officer Nunez's excessive force, and (3) the City of Madison, Alabama admitted the officers' actions were the result of its municipal policy.

Relying on body camera footage, defendants Officer Nunez, Officer Hose, and the City moved to dismiss. The district court considered the body camera footage and granted their motions to dismiss.

On appeal, Baker argues the district court erred by (1) considering the officers' body camera footage when ruling on the defendants' motions to dismiss without converting them into summary judgment motions, (2) granting qualified immunity to Officer Nunez, (3) dismissing Baker's failure-to-intervene claim against Officer Hose, and (4) dismissing his municipal liability claim against the City.

After careful review of the record and the briefs, and with the benefit of oral argument, we conclude that the district court properly considered the body camera footage, correctly ruled that Officer Nunez did not violate a constitutional right and thus Officer Hose had no duty to intervene, and accurately determined that

Baker's claim against the City failed as a matter of law.  Therefore, we affirm the dismissal of Baker's complaint.

## I.     BACKGROUND

### A.     Allegations in the Complaint

In his pro se complaint, Baker alleged the following.  Baker has epilepsy and sometimes has seizures.  Consequently, emergency medical personnel in the City know him and know about his condition.

On March 16, 2019, Baker and his friend were in a car together when they got in a "minor accident."  Paramedics arrived on the scene after the accident happened.  By the time paramedics arrived, Baker was having a seizure.

Officers Nunez and Hose arrived shortly thereafter.  Baker was still having a seizure.  Paramedics and Baker's friend told the police "over and over again" that Baker had suffered a seizure and that he was still in the throes of that seizure.  Officers Nunez and Hose "told Baker to get on a gurney and go to the hospital."  Baker declined and asked to speak to his mother.

Baker's friend advised Officers Nunez and Hose that Baker's seizure would likely pass in a few moments and Baker could not fully understand the police.  Paramedics also told Officers Nunez and Hose that Baker could not fully understand the police.  Nonetheless, Officer Nunez tased Baker "multiple times" while attempting "to make Baker get on the gurney to go to the hospital."

Baker alleged that he (1) was not combative with the police, (2) simply did not get on the gurney, (3) was not in danger from traffic, and (4) was not endangering anyone.

Later, Baker asked the City to investigate and reprimand the officers. In response, Baker received a letter from the City, advising him that the officers' actions were consistent with municipal policy.

## B.    Body Camera Footage

As the district court emphasized, the body camera footage from Officers Nunez and Hose tells a different story. Importantly, the footage contains both audio and video, is clear and easy to follow, and shows all the relevant conduct. Here is what the footage shows.

Around noon, Officer Nunez arrived on the scene after Baker, while driving, had rear-ended the vehicle in front of him. As Officer Nunez approached Baker's vehicle, (1) a person who had been in Baker's car was on the phone with an unidentified person and said he "d[id]n't know if [Baker] had a seizure or what, but he crossed the lane of traffic and rear-ended somebody"; (2) a paramedic was attending to Baker, who was still in the driver's seat of his vehicle; and (3) other paramedics were bringing a stretcher over to the driver's side of Baker's vehicle.

Officer Nunez walked to the back of Baker's vehicle and wrote down the license plate number.

22-10732                Opinion of the Court                    5

While Officer Nunez remained at the back of Baker's vehicle, the paramedics were able to get Baker out of his vehicle. Over the next minute, a paramedic repeatedly asked—at least thirteen times—for Baker to sit down on the stretcher. Baker remained standing outside his vehicle and would not sit down on the stretcher.

That paramedic also asked Baker to produce his driver's license. Baker did not respond to this request, prompting the paramedic to explain to Baker that if he could not respond to questions, he would have to be taken to the hospital.

Officer Nunez approached and said, "Hey, Curtis man. Have a seat, man." When Baker tried to push past a paramedic who was blocking the driver's side door of Baker's vehicle, Officer Nunez moved the stretcher aside to get closer to Baker. Officer Nunez told Baker to "relax" and explained that the paramedics were trying to help Baker.

For the next two minutes, Officer Nunez asked Baker to sit on the stretcher at least ten times, and the paramedics asked Baker to do the same at least nine more times. Baker continued to stand outside his vehicle and did not sit down on the stretcher that was next to the vehicle.

During this interaction, both Officer Nunez and a paramedic asked Baker to produce his driver's license. Baker put his hands in his pockets, but instead of a driver's license, Baker pulled out a lighter and tried to smoke a broken cigarette butt. Officer Nunez

told Baker he could smoke a cigarette after he had a seat on the stretcher.

While Baker fiddled with the broken cigarette, Officer Nunez asked one of the paramedics if Baker was going to the hospital. The paramedic told Officer Nunez that there was "something definitely wrong with [Baker]," and the paramedic wondered if Baker was (1) under the influence, (2) a diabetic, or (3) having a seizure. The paramedic added that he "highly doubt[ed]" it was a seizure. The paramedic also stated that they would check his blood sugar now.

Because Baker had ignored repeated requests to sit on the stretcher, the paramedics then asked Baker to lean against a concrete barrier on the road or his vehicle. Baker got closer to his vehicle but did not lean against it. Baker asked, "what's the problem?" Officer Nunez responded that Baker had just been in an accident, and the paramedics were trying to make sure Baker was okay.

One of the paramedics prepared the device to check Baker's blood sugar and then said to Baker, "let me borrow your finger for just a second." Baker immediately turned away from that paramedic.

Officer Nunez grabbed Baker's arm and turned Baker back around to face him. Baker replied, "get off me, man." Baker then said, "where my phone at" and dug through his pockets with both hands, looking for his phone.

Over the next two minutes, Baker tried to get back into his vehicle, despite just having had the rear-end automobile accident and despite the paramedics telling him to sit on the stretcher.

Baker first headed toward the open driver's door of the vehicle. Officer Nunez put his arm out to block Baker. Officer Nunez told Baker (1) to let the paramedics check him out first and (2) Officer Nunez would "call [Baker's] phone afterwards."

Baker again headed toward the open driver's door of his vehicle to get in the vehicle. Officer Nunez again grabbed Baker's arm, telling him "no." Baker pulled his arm away and said he was trying to "get in [his] motherfucking car" and told Officer Nunez to "move."

Officer Nunez tried to stop Baker from getting back in his vehicle, grabbing his arm. But Baker, becoming more agitated, broke free again and told Officer Nunez to "chill" and "get the fuck off [him]." Baker moved toward Officer Nunez, stating that Officer Nunez would "be in jail somewhere for fucking with [him]."

At this time, Officer Nunez backed away, drew his taser, and pointed it at Baker (but Officer Nunez did not fire it). Officer Nunez told Baker to "chill" and to "step back." Officer Nunez held his left hand out toward Baker, who pushed it away. Officer Nunez reported on his radio that "the suspect was being combative."

Next, Baker (1) turned away from Officer Nunez, (2) walked again toward the open driver's door, (3) pushed past one paramedic who tried to stop him, and (4) sat down sideways in the

driver's seat with his feet still on the road. Officer Nunez put his taser back in the holster, grabbed Baker's left arm, and attempted to remove Baker from the vehicle by pulling on Baker's left arm. Baker called Officer Nunez a "bitch" and resisted being removed from the vehicle. As Baker came out of the vehicle, he reached for Officer Nunez and moved toward him.[1]

Officer Nunez then stepped back, drew his taser again, and fired the taser, hitting Baker in the stomach. Officer Nunez's body camera footage shows that from approximately 12:06:36 to 12:06:48, Baker (1) fought the taser's charge, (2) moved back toward the driver's seat of his vehicle, (3) pulled off his sweatshirt, and (4) told Officer Nunez to "chill out."

Officer Nunez removed his taser's cartridge, loaded a new one, and again pointed the taser at Baker. When Officer Nunez threatened to deploy the taser again, Baker said, "Damn, that shit hurt my boy."

After firing his taser the one time, Officer Nunez told Baker at least sixteen times to turn around. Baker repeatedly did not turn around, continued to resist Officer Nunez's commands, and once again tried to get in his vehicle.

---

[1] The defendants characterize this action as a shove. It may have been a shove, but Officer Nunez's body camera footage does not clearly depict that. As explained more thoroughly below, *see infra* Section III.C, we construe all ambiguities in the footage in favor of Baker at the motion-to-dismiss stage.

More than two minutes after Officer Nunez had tased Baker, Officer Hose arrived on the scene. When Officer Hose approached Baker, Baker said, "Hey, Mr. Officer. Can y'all get this man? He just shot me in my stomach."

Officer Hose engaged Baker (who was still resisting Officer Nunez) and, with help from a third officer, subdued Baker and placed him in handcuffs.

At several points, Baker asked the officers to call his mother. Eventually, Baker's mother came to the scene. After extended discussion and the writing of reports, the officers allowed Baker to leave the scene with his mother.

## C.    Procedural History

In March 2021, Baker filed his pro se § 1983 complaint. Baker sued (1) Officer Nunez for excessive force in violation of the Fourth and Fourteenth Amendments, (2) Officer Hose for failure to intervene in Officer Nunez's allegedly unconstitutional use of force, and (3) the City for municipal liability because the officers' acts were the result of the City's unconstitutional policy.

Baker's complaint referenced a "video recording" of the incident several times, stating that "[u]pon information and belief,

it is averred that the video recording is a display of what happened."[2]

The defendants each moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).  In addition, Officer Hose filed the video footage from the body cameras of Officers Nunez and Hose. Baker, now represented by counsel, responded to the motions to dismiss.

On February 2, 2022, the district court held a telephonic hearing on the motions to dismiss.  During the hearing, Baker's counsel argued that the defendants' motions to dismiss did not really raise an "*Iqbal* or *Twombly* issue" because they relied on the body camera footage, which was "outside the record."  Baker's counsel argued that under the circumstances, the district court should allow Baker "very limited discovery" so he could "put[] that video evidence in context."

On February 8, 2022, the district court granted the defendants' motions to dismiss for failure to state a claim and dismissed Baker's claims with prejudice.  In doing so, the district court considered the body camera footage, which it concluded told

---

[2] The pro se complaint also alleged that the defendants refused to provide Baker with the video.  However, later when Officer Hose filed the footage with the district court, he provided notice that he would serve the footage on Baker via United States Postal Service Priority Mail.  According to the tracking information, Baker received the thumb drive containing the footage at 2:06 p.m. on April 20, 2021.  On appeal, Baker does not dispute that he received the footage from the defendants.

"a different story" from the allegations in Baker's complaint. Relying on *McDowell v. Gonzalez*, 820 F. App'x 989 (11th Cir. 2020) (unpublished), the district court concluded it was proper to consider the body camera footage because it met the requirements of the incorporation-by-reference doctrine.

The district court dismissed Baker's failure-to-intervene claim against Officer Hose because the footage showed Officer Hose did not arrive on the scene until two minutes after Officer Nunez tased Baker.

The district court dismissed the municipal liability claim against the City because Baker had not responded to the City's argument that the claim failed to satisfy the pleading standards of Federal Rule of Civil Procedure 8(a) and thus Baker had abandoned the claim. Alternatively, the district court concluded Baker, who "alleged only a single instance of officer conduct to support his claim," had failed to plausibly plead either an actionable policy or custom or prior ratification by the City's policymakers.

The district court dismissed Baker's excessive force claim against Officer Nunez, concluding that Officer Nunez was entitled to qualified immunity. To begin with, the district court determined that Baker had not shown Officer Nunez's use of force violated a clearly established right. Alternatively, the district court concluded that the body camera footage established that Officer Nunez's use of force was reasonable given the circumstances he faced, including Baker's "aggressive and non-compliant behavior"

and active resistance to Officer Nunez's "efforts to prevent him from getting in his car."

Baker timely appealed.

## II.    STANDARD OF REVIEW

We review de novo the district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *McGroarty v. Swearingen*, 977 F.3d 1302, 1306 (11th Cir. 2020). We also review de novo a district court's decision to grant the defense of qualified immunity on a motion to dismiss. *Davis v. Carter*, 555 F.3d 979, 981 (11th Cir. 2009).

We "may affirm on any basis in the record, regardless of whether the [d]istrict [c]ourt actually relied upon that basis in dismissing the plaintiff's claim." *Henley v. Payne*, 945 F.3d 1320, 1333 (11th Cir. 2019).

## III.    CONSIDERATION OF BODY CAMERA FOOTAGE AT THE MOTION-TO-DISMISS STAGE

On appeal, Baker argues as a threshold matter that the district court improperly considered the officers' body camera footage without first converting the defendants' motions to dismiss into summary judgment motions and permitting Baker to conduct limited discovery. We address that threshold issue first.

### A.    General Principles

Generally, when considering a motion to dismiss, the district court must limit its consideration to the pleadings and any

exhibits attached to it. *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000). If the parties present, and the court considers, evidence outside the pleadings, the motion to dismiss generally must be converted into a motion for summary judgment. Fed. R. Civ. P. 12(d); *Finn v. Gunter*, 722 F.2d 711, 713 (11th Cir. 1984).

There are two exceptions to this conversion rule: (1) the incorporation-by-reference doctrine and (2) judicial notice. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). Both exceptions permit district courts to consider materials outside a complaint at the motion-to-dismiss stage. Because only the incorporation-by-reference doctrine is at issue here, we need not address judicial notice.

Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) "the plaintiff refers to certain documents in the complaint," (2) those documents are "central to the plaintiff's claim," and (3) the documents' contents are undisputed. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Evidence is

"undisputed" in this context if its authenticity is unchallenged. *Horsley*, 304 F.3d at 1134.

Traditionally, we have applied the incorporation-by-reference doctrine to various types of documentary evidence. *See, e.g.*, *Hi-Tech Pharm., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018) (marketing label); *Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) (purchase agreement); *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225–26 (11th Cir. 2002) (book); *Horsley*, 304 F.3d at 1134–35 (news article). The question in this case is whether the incorporation-by-reference doctrine also applies to the body camera footage.

## B.    Application of the Incorporation-by-Reference Doctrine

Here, the requirements of the incorporation-by-reference doctrine are easily satisfied. First, Baker referenced the body camera footage in his complaint several times. At one point, the complaint even alleged that "[u]pon information and belief, it is averred that the video recording is a display of what happened." Further, the body camera footage was filed concurrently with Officer Hose's motion to dismiss. *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (explaining that "a document need not be physically attached").

Second, the body camera footage depicts the events that are central to Baker's claims. The footage shows all the relevant conduct and is particularly clear here because (1) the incident took place in broad daylight, so the area depicted in the footage is

well-lit, (2) the footage presents both visual and audio depictions of the events that transpired, and (3) for the most part, the viewer has a good angle of the events with no visual obstructions.

Third, the body camera footage is undisputed because Baker does not challenge the authenticity of the footage. *See Horsley*, 304 F.3d at 1134. There are no allegations or indications that the footage has been altered in any way, nor any contention that what the footage depicts differs from what actually happened.

Because the requirements of the incorporation-by-reference doctrine are met, the district court properly considered the body camera footage from Officers Hose and Nunez when ruling on the motions to dismiss.

## C.    Evaluating the Contents of Body Camera Footage

Before proceeding to the merits of Baker's claims, we address Baker's other objection to the consideration of the footage at the motion-to-dismiss stage. Baker argues that the footage is subjective and open to interpretation.[3]

We agree that, at times, videos do not paint the entire picture and may contain ambiguities that are subject to

---

[3] Significantly, this argument does not pertain to whether the district court properly incorporated by reference the body camera footage into the complaint because with the incorporation-by-reference doctrine, "undisputed" means that the authenticity is not challenged, *Horsley*, 304 F.3d at 1134, *not* that the incorporated evidence is free from any disagreement over the meaning of its content.

interpretation. There can be many reasons for that. Perhaps the video was shot from a bad angle, and thus the viewer cannot see all of the events as they unfold. Or perhaps the video contains a visual representation of what happened but does not contain crucial audio. When that is true, courts must construe all ambiguities in the video footage in favor of the plaintiff, as they must, at this stage, construe all ambiguities in the written pleadings in the plaintiff's favor. See Speaker v. U.S. Dep't of Health & Hum. Servs., 623 F.3d 1371, 1379 (11th Cir. 2010).

But where a video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account, see Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1315 (11th Cir. 2021), and view the facts in the light depicted by the video, see Scott v. Harris, 550 U.S. 372, 381, 127 S. Ct. 1769, 1776 (2007). After all, courts are not required to rely on "visible fiction." Scott, 550 U.S. at 380–81, 127 S. Ct. at 1776.

In sum, while reviewing the district court's ruling on the defendants' motions to dismiss, we have credited, as we must, Baker's factual allegations where no obviously contradictory video evidence is available. But the footage plainly contradicts Baker's alleged version of events, leading us to view most of the facts as depicted by the video. Cf. Pourmoghani-Esfahani, 625 F.3d at 1315 (explaining that a video may not "obviously contradict[]" a plaintiff's version of the facts because the video "fails to convey spoken words or tone" or "fails to provide an unobstructed view of the events"). That said, we turn to qualified immunity generally

and then specifically to whether Officer Nunez violated Baker's constitutional rights.

## IV.    QUALIFIED IMMUNITY

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

Qualified immunity balances two important public interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).

When a government official raises the "defense of qualified immunity, we first consider whether the defendant government official has proved that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Gonzalez v. Lee Cnty. Hous. Auth.*, 161 F.3d 1290, 1294–95 (11th Cir. 1998) (alteration and quotation marks omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

"To overcome a qualified immunity defense, the plaintiff must make two showings." *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1354 (11th Cir. 2022) (quotation marks omitted). "First, the plaintiff must establish that the defendant violated a constitutional right." *Id.* (emphasis and quotation marks omitted). "Second, the plaintiff must show that the violation was clearly established." *Id.* (emphasis and quotation marks omitted). "Both elements must be satisfied for an official to lose qualified immunity." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010). We may analyze these two elements in whatever order is most appropriate for the case. *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818.

## V.    OFFICER NUNEZ'S USE OF FORCE

Baker claims Officer Nunez used excessive force against him when Officer Nunez tased him in violation of the Fourth Amendment. Because no one disputes that Officer Nunez was acting within the scope of his discretionary authority when he tased Baker, we first outline the applicable Fourth Amendment principles and then address whether Baker's complaint and the incorporated body camera footage established a constitutional violation.

### A.    Fourth Amendment Principles

The Fourth Amendment provides a "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. The Fourth Amendment's freedom from

unreasonable seizures includes the right to be free from excessive force. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009).

In excessive force cases, the first qualified immunity inquiry—i.e., whether a plaintiff's constitutional rights were violated—is governed by the Fourth Amendment's objective reasonableness standard. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). "Under that standard, we judge the officer's use of force 'on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021) (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010)).

To determine whether the force was objectively reasonable, courts examine the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989). Other considerations are the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically. *Hadley*, 526 F.3d at 1329.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S. Ct. at 1872.

Ultimately, "[a]n officer's use of force is excessive under the Fourth Amendment if the use of force was objectively unreasonable in light of the facts and circumstances confronting the officer." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) (alteration adopted) (quotation marks omitted).

## B.    No Constitutional Violation by Officer Nunez

The body camera footage shows that as Officer Nunez was investigating the automobile accident (1) Baker repeatedly ignored instructions from Officer Nunez and the paramedics to sit down on the stretcher, (2) Baker failed to provide Officer Nunez with his driver's license when requested, instead attempting to smoke a broken cigarette, (3) Baker ignored an instruction from one of the paramedics to lean against a concrete barrier on the road or against his vehicle, (4) Baker cursed at Officer Nunez, (5) Baker broke free from Officer Nunez's grip, and (6) Baker got back into the driver's seat of his vehicle despite Officer Nunez's commands not to do so.

The circumstances confronting Officer Nunez thus included that Baker had just rear-ended someone, was not following the paramedics' or Officer Nunez's commands, and instead attempted three times to go back to his vehicle, even successfully reentering it once. Under these circumstances, a reasonable officer on the scene would perceive that Baker, at best, was not safe to drive his

vehicle, or, at worst, might try to flee using his vehicle (which itself could be used as a deadly weapon), thereby endangering Officer Nunez, the paramedics, and nearby motorists because of Baker's apparent state of disorientation.

The body camera footage further shows that Officer Nunez tried to remove Baker from the car verbally and physically. But when faced with Baker's physical resistance, Officer Nunez used his taser (a nondeadly use of force) once in dart-mode to try to obtain Baker's compliance.[4]

"Although being struck by a taser gun is an unpleasant experience, the amount of force [Officer Nunez] used—a single use of the taser gun causing a one-time shocking—was reasonably proportionate to the need for force and did not inflict any serious injury." See Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004). Indeed, the body camera footage shows that Baker was not incapacitated by the taser: Baker fought the taser's charge, moved toward the driver's seat of his vehicle again, pulled off his sweatshirt, and told Officer Nunez to "chill out." "The single use

---

[4] In dart-mode, the taser:

> uses compressed nitrogen to propel a pair of "probes"—aluminum darts tipped with stainless steel barbs connected to the [taser] by insulated wires—toward the target at a rate of over 160 feet per second. Upon striking a person, the [taser] delivers a 1200 volt, low ampere electrical charge through the wires and probes and into [the person's] muscles.

Bryan v. MacPherson, 630 F.3d 805, 824 (9th Cir. 2010) (footnote omitted).

of the taser gun may well have prevented a physical struggle and serious harm to either" Baker or Officer Nunez. *See id.*; *see also Smith v. LePage*, 834 F.3d 1285, 1294 (11th Cir. 2016) ("[W]here a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or officer." (quotation marks omitted)).

Baker argues *Helm v. Rainbow City*, 989 F.3d 1265 (11th Cir. 2021), controls the outcome here. We disagree. The *Helm* facts are easily and materially distinguishable from our facts. In *Helm*, a seventeen-year-old girl, who was suffering a grand mal seizure, was tased three times while four or five officers held her down. 989 F.3d at 1269–70 & n.1. The girl was not resisting or combative, and the officers did not dispute that the teenage girl presented no threat to them and committed no crime. *Id.* at 1270, 1274. Unlike the teenage girl in *Helm*, Baker was unrestrained, combative, and noncompliant with repeated police commands when he was tased.

We believe the facts here are more like *Draper v. Reynolds*. In that case, a police officer pulled over the plaintiff, who was driving a tractor trailer truck, "because [the truck's] tag light was not appropriately illuminated under Georgia law." 369 F.3d at 1272. During the ensuing traffic stop, the plaintiff "acted in a confrontational and agitated manner, paced back and forth, and repeatedly yelled at [the officer]." *Id.* at 1276–77. When the plaintiff failed to comply with the officer's fifth request to produce certain documents, the officer tased him. *Id.* at 1273. We held that the use of the taser "was reasonably proportionate to the difficult,

tense[,] and uncertain situation that [the officer] faced in this traffic stop[] and did not constitute excessive force." *Id.* at 1278.

In light of our holding in *Draper*, Officer Nunez's use of the taser was justified because of (1) Baker's repeated failure to comply with Officer Nunez's commands, (2) Baker's unsafe driving that had just caused an automobile accident, (3) Baker's repeated efforts to get back in the vehicle, (4) Baker's physical resistance to Officer Nunez's attempts to remove him from the vehicle, and (5) the tense, uncertain, and rapidly evolving series of events. What started as a routine incident response escalated. Officer Nunez "was not required to wait and hope for the best" before making the split-second decision to tase Baker. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alteration adopted) (quotation marks omitted).

Based on the totality of the circumstances, we conclude that Officer Nunez's single use of a taser in dart-mode was objectively reasonable and did not constitute excessive force. *See, e.g.*, *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008) ("[I]n a difficult, tense[,] and uncertain situation[,] the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." (quotation marks omitted)).

Because we conclude Officer Nunez did not violate a constitutional right, we need not reach the other qualified immunity question. Accordingly, we affirm the district court's grant of qualified immunity to Officer Nunez.

## VI.    FAILURE TO INTERVENE

Baker sued Officer Hose for failure to intervene.   "[A]n officer can be liable for failing to intervene when another officer uses excessive force."  *Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000).  Specifically, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[] can be held liable for his nonfeasance."  *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (quotation marks omitted).

Baker's failure-to-intervene claim fails for two reasons.  First, because Officer Nunez's use of the taser did not constitute excessive force, *see supra* Section V.B, Officer Hose had no obligation to intervene.  *See Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009) (explaining that there is "no attendant obligation to intervene" if the other officer's force is not excessive).

Second, even assuming Officer Nunez's use of the taser was excessive, Officer Hose did not witness Officer Nunez's use of the taser and thus did not have the ability to intervene to prevent that use of force.  The body camera footage shows that Officer Hose arrived at the scene more than two minutes *after* Officer Nunez fired his taser.  That alone is fatal to Baker's claim.  *See Priester*, 208 F.3d at 924 (explaining that liability for failure to intervene "only arises when the officer is in a position to intervene and fails to do so").

For these reasons, we affirm the district court's dismissal of Baker's failure-to-intervene claim against Officer Hose.

## VII.    MUNICIPIAL LIABLITY

Baker's claim against the City is based on the City's alleged determination that Officers Nunez and Hose acted "consistent with [m]unicipal policy." The Supreme Court's *Monell* decision authorizes lawsuits directly against municipalities where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S. Ct. 2018, 2035–36 (1978).

A municipality may be held liable for the actions of its law enforcement officers only when the officers' execution of official policy (or custom) is the moving force of a constitutional violation. *Id.* at 694, 98 S. Ct. at 2037–38. Thus, to establish municipal liability, a plaintiff must show that (1) his constitutional rights were violated, (2) the municipality had a policy (or custom) that constituted deliberate indifference to that constitutional right, and (3) the municipal policy (or custom) caused the violation. *McDowell v. Brown*, 392 F.3d 1283, 1289–90 (11th Cir. 2004).

Here, because there was no underlying constitutional violation, Baker's municipal liability claim against the City fails as a matter of law. *See Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying

constitutional violation."); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573 (1986) ("[None] of our cases authorize[] the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." (emphasis omitted)).

We therefore affirm the district court's dismissal of the municipal liability claim on this basis.[5]

## VIII.  CONCLUSION

We conclude that the district court properly considered the body camera footage from Officers Nunez and Hose when ruling on the defendants' motions to dismiss. We affirm the district court's grant of the defendants' motions to dismiss.

---

[5] We also reject Baker's argument that he should have been allowed to amend his complaint before the district court dismissed it with prejudice. "A district court is not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court." *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc). Although Baker filed his complaint pro se, Baker was represented by counsel (1) while he opposed the defendants' motions to dismiss, (2) at the district court's hearing on the motions to dismiss, and (3) when the dismissal occurred. Yet Baker's counsel never sought to amend Baker's complaint before the district court.

22-10732                Opinion of the Court                27

AFFIRMED.