**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 25-10718
Non-Argument Calendar
_____

TIMOTHY E. JOHNSON,

*Plaintiff-Appellant,*

*versus*

CITY OF PALM BAY, FLORIDA,

*Defendant,*

AGENT TONY WILLIAMS,
OFFICER BREET NAYMIK,
AGENT COLE MCDONALD,
   In their individual capacities,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:24-cv-00791-WWB-LHP
_____

Before ROSENBAUM, BRANCH, and GRANT, Circuit Judges.

PER CURIAM:

Timothy Johnson, proceeding *pro se*, appeals the district court's order dismissing his civil complaint accusing several Florida police officers of using excessive force against him on the ground that the officers are entitled to qualified immunity. He argues that the officers are not entitled to qualified immunity because the officers were wearing plain clothes, did not identify themselves, and he was lying on the ground with his hands out when officers fired their weapons at him without giving him any commands or a chance to comply. After review, we agree with the district court that the body cam footage conclusively refutes much of Johnson's alleged version of events and demonstrates that the officers are entitled to qualified immunity. Accordingly, we affirm.

## I.    Background

In 2024, Johnson filed a *pro se* 42 U.S.C. § 1983 civil complaint against Florida's Palm Bay police officers Tony Williams, Breet Naymik, and Cole McDonald in their individual capacities for the use of excessive force in violation of the Fourth, Eighth, and Fourteenth Amendments. Johnson alleged that, on June 14, 2023, he was parked on a dead-end street next to a park when an unidentified pickup truck pulled up behind him. Johnson "got scared" and when he backed up to leave, he hit the truck. He then "took off" and drove his car "on the park field." At some unspecified point, he stopped on the field, exited his car, and ran into the yard of a home. He alleged that, as he was entering the

yard, he "heard a police radio so [he] assume[d] that officers were near so [he] laid down behind [a] car that was in the backyard with [his] hands in front of [him]." According to Johnson, Officer Williams came up behind him, did not identify himself, and shot Johnson in the foot. Then Officers Naymik and McDonald also opened fire on Johnson, firing a total of 16 shots, all while Johnson was "laying on the ground empty handed with [his] hands out in front of [him]." Johnson alleged that a bullet grazed his forehead while "two to three" others hit him in one of his thighs. Johnson further alleged that, when he turned to face Officer Williams and asked if Williams was going to kill him, Williams for the first time "told [Johnson] to keep [his] hands on the ground."

Johnson asserted that Officer Williams's body cam was activated, but there was no audio until after the officers fired their weapons at him. He claimed that another officer who was not named in the suit, Brandon Neely, said in interview that "he did not hear anyone mention [that] they saw Johnson with a firearm prior to the shots being fired" and Neely did not personally see Johnson in possession of a gun. Nevertheless, Johnson admitted in his complaint that he had a gun at the time of the encounter, but he maintained that he was not a threat to anyone because he did not have the gun in his hands and "there was no bullet in the chamber." He alleged that none of the officers "said they [saw] him with a firearm" until they rolled him over because he had the gun

hidden under his chest.[1]  Johnson alleged that he had to undergo two surgeries because of his injuries, the bone in his foot was shattered, and he spent five months in a wheelchair.  He requested $1.2 million in compensatory damages and $100,000 for punitive damages.

The officers filed a joint motion to dismiss Johnson's complaint, pursuant to Federal Rule Civil Procedure 12(b)(6), on the ground that Johnson failed to state a claim upon which relief could be granted because the officers were entitled to qualified immunity.  They maintained that the body cam footage, which Johnson referenced in his complaint, established that they did not use excessive force, and they submitted body cam footage with their motion.  In this footage, at approximately 6:14 p.m., Johnson's car can be heard hitting the officers' truck, and then his car is visible on camera careening up onto the curb and driving through a fence, and into the park.  Officers can be heard yelling "hands, "hands," and stating "he hit us, he hit us."  One of the officers from the truck then begins a foot pursuit upon seeing the vehicle stop a short distance away near what appears to be a private residence.  When

---

[1] Although Johnson did not allege in his complaint whether he was arrested following this police encounter, the district court took judicial notice of state court records establishing that Johnson was arrested and charged with multiple offenses, including trafficking in, or possession of, a controlled substance, aggravated battery with a deadly weapon (a motor vehicle) upon a law enforcement officer, possession of a firearm by a convicted felon, and resisting an officer without violence.  We also take judicial notice of this information as well.

this officer reached the car, the driver's side door was open, and Johnson was not in the car.

Meanwhile, Officer Williams's bodycam, which was not initially recording audio, showed Officer Williams jump the fence into the yard of a private residence and approach the back of the property. As Williams rounded the corner of the property, he observed Johnson lying on the ground in front of a vehicle. Williams drew his gun and aimed it at Johnson. Johnson's hands were not visible and appeared to be underneath his body. Johnson was also moving his head from side to side, looking at Williams and then away. Williams fired into the ground near Johnson. Williams then turned on the audio for his body camera while shouting "hands, let me see your hands." Johnson did not move, and other officers briefly fired multiple shots.[2] Officer Williams then yelled "hold fire," and Johnson's hands were visible and extended flat out in front of him above his head.

Another officer, yelled from behind Williams, "gun" and Williams stated "yeah." An officer not visible in the frame asked, "where's his hands," and Williams responded, "his hands are straight out, the gun is still under him." A few seconds later, Williams repeated to other officers approaching, "I see both hands, the gun is under him." Williams shortly thereafter stated "there's also a bag under him too." Officers then waited for a safety shield

---

[2] Audio from the bodycam footage from the officer engaged in the foot pursuit confirms that multiple "let me see your hands" commands were issued before officers fired any shots at Johnson.

to arrive before approaching Johnson.  During this time, Johnson attempted to move several times and stated, "ya'll clipped me," and officers continued to instruct him not to move.  Before approaching Johnson, Williams told the other officers that the gun was near Johnson's left chest.  After approaching with the shield, officers removed the gun from under Johnson and secured him.

Johnson opposed the motion to dismiss, arguing that the body cam footage showed that Officer Williams did not discover that Johnson had a gun until he was lying on the ground; that Williams knew the gun was under Johnson's chest, not in his hands; and that Johnson was not a threat to officers.  Johnson then reiterated his version of events incorporating references to the body cam footage.  He maintained that the officers were not entitled to qualified immunity.

The district court granted the motion to dismiss, concluding that the body cam footage was properly before the court and conclusively established that the officers did not use excessive force.  Accordingly, the district court determined that the officers were entitled to qualified immunity.  This appeal followed.

## II.    Discussion

Johnson argues that the district court erred in granting qualified immunity to the officers because it is disputed whether the officers gave Johnson any verbal commands before using force or whether they gave him any opportunity to comply with commands before deploying force.  He maintains that the officers wore "plain clothes and ski masks," and he was not "aware they

could be police" until he heard their radios as he lay on the ground. He asserts that he did not resist and could not comply with the officers' demands to show his hands because "he was pinned down on the ground by gunfire." Thus, he contends the use of force was excessive.

"We review a district court's grant of [a] Rule 12(b)(6) . . . motion[] *de novo*." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1297 (11th Cir. 2024). Generally, at the motion to dismiss stage, "we accept the facts alleged in the complaint as true and view them in the light most favorable to the plaintiff." *Id*. When, as here, a plaintiff references bodycam footage in the complaint, the district court may consider it under the incorporation-by-reference doctrine provided that it is "central to the plaintiff's claim" and "its authenticity is unchallenged." *Baker v. City of Madison*, 67 F.4th 1268, 1276–77 (11th Cir. 2023) (quotations omitted); *see also Johnson*, 107 F.4th at 1300 (holding that "when resolving a motion to dismiss . . . a court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged"). "[W]here [the] video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account, and [we] view the facts in the light depicted by the video." *Baker*, 67 F.4th at 1277–78 (citation omitted). On the other hand, because we are at the motion to dismiss stage, "[we] must construe all ambiguities in the video footage in favor of the plaintiff." *Id*. at 1277.

Qualified immunity shields law enforcement officials from suit against them in their individual capacities for discretionary actions they perform in carrying out their duties, *Brooks v. Miller*, 78 F.4th 1267, 1279 (11th Cir. 2023), so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted). "[B]ecause government officials are not required to err on the side of caution, qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." *Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002) (alteration adopted) (quotations omitted). In other words, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (quotations omitted).

The qualified immunity inquiry involves a burden-shifting analysis. *Lee*, 284 F.3d at 1194. The first step requires a defendant to show that he was acting within the scope of his discretionary authority when committing the challenged act.[3] *Id*. "Once the defendant does that, the burden shifts to the plaintiff, who must show that qualified immunity is not appropriate" by establishing that: "(1) the defendant violated a constitutional right, and (2) that constitutional right was clearly established at the time of the

---

[3] Johnson does not dispute that the officers were acting within the scope of their discretionary authority. Therefore, we focus on whether Johnson established that the officers violated a constitutional right and that the right was clearly established at the time of the defendant's actions.

defendant's actions." *Brooks*, 78 F.4th at 1280 (quotations omitted). "Both elements must be satisfied for an official to lose qualified immunity." *Baker*, 67 F.4th at 1278 (quotations omitted).

The Fourth Amendment sets forth the "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This right encompasses the right to be free from the use of excessive force during an arrest. *Graham v. Connor*, 490 U.S. 386, 394–95 (1989). Nevertheless, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. "To determine if the use of force exceeded that which is necessary, courts are required to balance carefully the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotations omitted).

Excessive force claims are judged under the Fourth Amendment's objective reasonableness standard.[4] *Graham*, 490 U.S. at 395–96. "That standard requires us to ask whether the officer's conduct was objectively reasonable in light of the facts

---

[4] Although Johnson also referenced in his complaint his right to be free from excessive force under the Eighth Amendment, the Supreme Court has made clear that where, as here, the excessive force claim arises in the context of an arrest, it is properly analyzed under the Fourth Amendment, not the Eighth. *Graham*, 490 U.S. at 394.

confronting the officer." *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (alterations adopted) (quotations omitted); *see also Jean-Baptiste*, 627 F.3d at 821 ("[T]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." (quotations omitted)). Whether the force used was reasonable is dependent on the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "Other considerations are the need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted . . . ." *Baker*, 67 F.4th at 1279. Importantly, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Jean-Baptiste*, 627 F.3d at 821 (alteration adopted).

Here, in light of the facts and circumstances confronting the officers, the use of deadly force to secure Johnson was reasonable. Specifically, after an unmarked police truck pulled up behind Johnson's car, Johnson reversed his car, ran into the truck, and then sped off erratically, driving up on the curb, crashing through a

chain link fence, and speeding off into the park. Johnson then drove a short distance before abandoning his vehicle, fleeing on foot, and entering the fenced backyard of a private residence while armed.[5] Then, even though he admitted that he heard police radios, Johnson laid down in front of a car and put his gun underneath his chest. A reasonable officer confronting those circumstances would have viewed Johnson's actions as an attempt to evade police that not only endangered officers but the community at large. Furthermore, contrary to Johnson's allegations, the bodycam footage establishes that Officer Williams knew that Johnson was armed, and Johnson's hands were

---

[5] Johnson contends that the officers were wearing "plain clothes and ski masks" and implies that he was unaware that they were officers. We note that all of the officers visible on the bodycam footage are wearing official police uniforms, with visible badges on their chests and emblazoned in large, capital letters with "POLICE," and no one is wearing a ski mask. Also, at least two of the vehicles on scene at the arrest location were marked police cruisers with their lights on. Not only that, but it was daylight when these events occurred, so the officers and their attire were plainly visible. Additionally, Johnson admitted in his complaint that when he exited his vehicle and ran into the nearby yard, he heard police radios, meaning, at that point, he was aware that the persons pursuing him were police. Regardless, what Johnson knew or believed in the moment is not relevant to the qualified immunity analysis. *See Jean-Baptiste*, 627 F.3d at 821 ("[T]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." (quotations omitted)). And it was not unreasonable, based on the camera footage and facts alleged—even viewed in the light most favorable to Johnson—for the officers to believe Johnson knew they were officers trying to effect an arrest when they yelled for him to show his hands, but he kept them underneath himself until after shots were fired.

12                    Opinion of the Court                    25-10718

underneath him with the gun when Officer Williams approached Johnson. A reasonable officer confronted with these circumstances would have viewed Johnson as posing a significant threat to the safety of the officers and others who might be in the area. Moreover, contrary to Johnson's allegations, the bodycam footage establishes that Johnson did not respond to the commands to show his hands until after shots were fired. Under these rapidly evolving and unpredictable circumstances, we conclude that the officers' use of deadly force was not objectively unreasonable to fully secure Johnson. The officers were not required to wait for Johnson to move or to pull his gun before using deadly force to stop him.[6] *See Jean-Baptiste*, 627 F.3d at 821 (holding that, regardless of whether the suspect pointed the gun at the officer, the officer's use of deadly force against the suspect was reasonable because the person was suspected of committing violent crimes, was armed, attempted to elude police, and "posed a threat of serious physical injury to [the officer] and to the citizens in the surrounding residential area"); *see also Crenshaw v. Lister*, 556 F.3d 1283, 1292–93 (11th Cir. 2009) (concluding that the deployment of a police canine against a suspect who suffered 31 bites was a reasonable use of force even though the suspect had said he wanted to surrender because officers believed the suspect was armed and "it was objectively reasonable for [the officer] to question the sincerity" of the suspect

---

[6] We note that the officers fired shots only briefly and did not shoot again once Johnson complied and placed his hands above his head.

based on the suspect's earlier conduct of fleeing from police first in a car then on foot and hiding in a wooded area).

In sum, we have credited, as we must at this stage, Johnson's factual allegations except where they are obviously contradicted by the body cam footage, and we conclude that the *Graham* factors—including the severity of the crime at issue (hitting a police vehicle and fleeing from police), and the fact that Johnson was armed, actively attempting to evade arrest, and posed an immediate threat to the safety of the officers and others in the residential area—all weigh in favor of the reasonableness of the use of deadly force in this case. *Graham*, 490 U.S. at 396–97. Accordingly, because Johnson failed to show a constitutional violation, the district court properly granted the officers' motion to dismiss based on qualified immunity.

**AFFIRMED.**