[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10130

Non-Argument Calendar

_____

KRYSTEN GARNER,
on behalf of minor R.C. and the ESTATE
OF ANDREW CAMPBELL,
on behalf of
MINOR CHILD
deceased
ANDREW CAMPBELL,

                                                          Plaintiff-Appellee,

*versus*

ANTONIA JAMERSON

                                                          Defendant,

WARREN BALTES,
JUSTIN MOCK,
LOWELL CLARK,
DOUGLAS PERNELL,
RUTLEDGE SP WARDEN, et al.,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 4:22-cv-00094-CDL

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and JILL PRYOR, Circuit Judges.

PER CURIAM:

Cadet Warren Baltes and six supervisory officials of the Georgia Department of Corrections—Lieutenants Justin Mock, Lowell Clark, and Douglas Pernell, Warden Reagan Black, Regional Director Scott Crickmar, and Commissioner Timothy Ward—appeal the denial of their motion to dismiss a complaint by Krysten Garner on behalf of the estate and minor child of Andrew Campbell, a disabled veteran who committed suicide while incarcerated at Rutledge State Prison. The officials argue that the district court erred by denying them qualified immunity. We affirm.

At this stage, we accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *See Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016). Campbell, a former Marine, became disabled while deployed in Afghanistan and suffered from mental illness. He was placed in a single-inmate solitary confinement cell in the "G-Building." On April 2, 2020, corrections officer Antonia Jamerson, who is not a party to this appeal, and Baltes, who was in training, were the only officers staffing the G-Building. That evening, Jamerson found Campbell dead from hanging himself with a sheet tied to the bars on his cell door window.

Garner alleges that Jamerson and Baltes knew that Campbell suffered from severe mental health conditions and that he was on a suicide safety protocol that required observation every 15 minutes. Jamerson and Baltes knowingly failed to observe Campbell on the night of his death, failed to discover him until "long after he was already dead," and were deliberately indifferent to his safety and well-being. The department investigated Campbell's death, and Warden Black stated that the video surveillance revealed that "rounds had been made outside required time and wrong staff" and recommended adverse action against Jamerson and Baltes. Jamerson falsified observation logs to cover up his failure to conduct safety checks that night and was terminated for "failure to perform assigned duties, falsification of documents, and untimely reporting/documentation."

Garner alleges that Mock, Clark, and Pernell were responsible for staffing the G-Building and knew that staffing the building with only an officer and a trainee would make it impossible to perform the suicide safety protocol. Because of severe understaffing, the prison had no on-duty captain the night of Campbell's death, so Pernell, a lieutenant, had to serve as "Acting Captain." Mock, Clark, and Pernell also knew that the G-building officers failed to conduct adequate safety observations of high-risk inmates but never corrected the officers. And they knew that the overuse of solitary confinement and lack of safety observations was part of a history of widespread abuse but failed to correct these problems.

Garner alleges that Black, Crickmar, and Ward established customs and policies that caused the prison to be grossly understaffed and to overuse and abuse solitary confinement. They knew that officers lacked necessary supervision, failed to conduct required rounds and safety observations, and lacked necessary training in inmate supervision and suicide prevention, but they failed to correct these problems.

After Baltes, Jamerson, and the supervisors moved to dismiss based on qualified immunity, Fed. R. Civ. P. 12(b)(6), the district court denied their motion. The district court ruled that the complaint sufficiently alleges that Jamerson and Baltes had subjective knowledge of a strong likelihood that Campbell would commit suicide and deliberately took no action to prevent his suicide, which violated clearly established law. It ruled that the complaint alleges plausible facts to support the reasonable inference that the

supervisors knew that officers routinely failed to conduct safety checks on high-risk inmates, which was part of a widespread pattern of abuse due to severe understaffing, and the supervisors failed to make the necessary staffing adjustments despite the obvious risks. And it ruled that it was clearly established that failing to act despite having knowledge of a serious risk of harm to an inmate amounted to deliberate indifference, so the supervisors were not entitled to qualified immunity.

We review an order denying qualified immunity at the motion-to-dismiss stage *de novo*. *Id.* We accept the allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Id.*

Qualified immunity shields officials acting within their discretionary authority from liability when their conduct does not violate a federal right that was clearly established when it occurred. *Williams v. Aguirre*, 965 F.3d 1147, 1156 (11th Cir. 2020). If an official acted within the scope of his discretionary authority, a plaintiff must prove "that qualified immunity is not appropriate." *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010) (citation omitted). Because it is undisputed that the officials were acting within the scope of their discretionary duties when the alleged constitutional violations occurred, we ask whether Garner's allegations, accepted as true, "show that [each] official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015).

"In a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed *deliberate indifference* to the prisoner's taking of his own life." *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015). To be deliberately indifferent, an official must have subjective knowledge of a risk of serious harm and "deliberately disregard a strong likelihood rather than a mere possibility that the self-infliction of harm will occur." *Snow ex rel. Snow v. City of Citronelle, Alabama*, 420 F.3d 1262, 1268 (11th Cir. 2005) (quotation marks omitted); *see Gish v. Thomas*, 516 F.3d 952, 954–55 (11th Cir. 2008). "Where prison personnel directly responsible for inmate care have knowledge that an inmate has . . . threatened . . . suicide, their failure to take steps to prevent that inmate from committing suicide can amount to deliberate indifference." *Greason v. Kemp*, 891 F.2d 829, 835–36 (11th Cir. 1990); *see Farmer v. Brennan*, 511 U.S. 825, 836 (1994) ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.").

The district court did not err in determining that Baltes and the supervisors were not entitled to qualified immunity. The complaint alleges that Baltes had subjective knowledge of a high risk that Campbell would attempt suicide but deliberately failed to act to prevent his suicide. It alleges that Baltes knew that Campbell suffered from severe mental health conditions that warranted placement on a suicide safety protocol, but Baltes's deliberate disregard

for these serious medical needs caused Campbell to experience pain and suffering and to take his life. *See Snow*, 420 F.3d at 1268.

Baltes argues that it was not clearly established that his alleged failure to conduct timely safety checks violated Campbell's constitutional rights. But we disagree. Taking Garner's allegations as true, Baltes was deliberately indifferent toward Campbell's safety because, although he knew that Campbell had severe mental health needs and posed a high risk of self-harm, Baltes did not perform even cursory supervision on the night of Campbell's death. Campbell's body was not discovered until "long after he was already dead." Our caselaw clearly established when the suicide occurred that, when an officer fails to protect an inmate who poses a serious risk of suicide and that failure amounts to deliberate indifference, the officer violates the prisoner's constitutional right. *See Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396 (11th Cir. 1994); *Greason*, 891 F.2d at 835–36. Baltes was not entitled to qualified immunity.

The district court also did not err in denying the supervisors qualified immunity. To plead supervisory liability for deliberate indifference, Garner must allege either that the supervisors "personally participated" in the alleged unconstitutional conduct or that there was a "causal connection" between their actions and the alleged constitutional deprivation. *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1355 (11th Cir. 2022). A "causal connection" can be established by a history of widespread abuse that put the supervisor on notice of the need to correct the alleged deprivation, which he

failed to do; a custom or policy of deliberate indifference to a constitutional violation; or facts that support an inference that the supervisor directed his subordinates to act unlawfully, or knew they would act unlawfully, and failed to stop them. *Id.*

Garner's complaint alleges a causal connection between the supervisors' conduct and Jamerson and Baltes's deliberate indifference. It alleges that the inmate suicide rate in Georgia prisons—involving at least 125 suicides since 2017—was double the national average due to severe understaffing, high turnover, poor training, lack of supervision, abuse of solitary confinement, and failure to discipline officers. The supervisors allegedly knew about but failed to correct these widespread abuses. They allegedly adopted a custom of allowing officers to disregard required suicide safety protocol without consequence, to the point that it was "widely known" that officers routinely falsified door charts and observation logs. Mock, Clark, and Pernell allegedly had actual knowledge that G-Building was understaffed on the night of Campbell's suicide. Because the complaint adequately alleges a causal connection between the supervisors' conduct and a clearly-established constitutional violation, *see id.*, the district court did not err by denying them qualified immunity at this stage.

We **AFFIRM** the order denying the motion to dismiss Garner's complaint based on qualified immunity.