[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

———————————————

No. 21-13779

———————————————

STEVE ROBERT,

Plaintiff-Appellant,

*versus*

CITY OF BOCA RATON, FLORIDA,
JEREMY CODLING,
CHIEF DANIEL ALEXANDER,
DEPUTY CHIEF, MICHELLE MIUCCIO,

Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 9:18-cv-81227-AHS

————————————

Before JILL PRYOR, BRANCH, and HULL, Circuit Judges.

HULL, Circuit Judge:

Plaintiff-Appellant Steve Robert worked as a probationary police officer for the City of Boca Raton Police Department (the "City"). Throughout his probationary term, Robert struggled with timely and correctly completing his police paperwork with no signs of improvement. As a result, Chief of Police Daniel Alexander and Deputy Chief of Police Michelle Miuccio gave Robert a choice: resign or they would ask the City Manager to terminate Robert.[1] Robert resigned.

Robert then sued the City, Chief Alexander, Deputy Chief Miuccio, and Jeremy Codling—Robert's supervisor. Robert, who is Black, brought these claims against each defendant: (1) race discrimination under Title VII and the Florida Civil Rights Act ("FCRA"), and (2) race discrimination under 42 U.S.C. § 1983.[2]

---

[1] Boca Raton's City Charter gives the City Manager the power to "suspend or remove all city employees." Charter of the City of Boca Raton art. IV, § 4.04(a), https://perma.cc/B84F-DLDB.

[2] In previous versions of his complaint, Robert also brought (1) a hostile work environment claim, which he later dropped; and (2) a claim under 42 U.S.C. § 1981, which the district court determined was merged within his § 1983 claim. These claims are not relevant to this appeal.

The defendants moved for summary judgment, which the district court granted. First, the district court (1) determined Robert sued the individual defendants in their official capacities only, (2) concluded those claims were duplicative of Robert's claims against the City, and (3) entered summary judgment on Robert's claims against the individual defendants.

Second, the district court granted summary judgment to the City on Robert's remaining claims. Turning to Robert's Title VII and FCRA claims against the City, the district court determined Robert failed to present sufficiently similar comparators and thus did not establish a prima facie case of race discrimination under the *McDonnell Douglas*[3] burden-shifting framework.

As to Robert's § 1983 claim against the City, the district court found (1) the City Manager was the final policymaker as to the termination of City employees and therefore was the only official whose decision could subject the City to § 1983 liability, and (2) because Robert resigned, and the City Manager never made the decision to fire Robert, the City could not be liable.

Robert appeals the district court's grant of summary judgment, raising the following issues: (1) whether he presented sufficiently similar comparators; (2) whether his circumstantial evidence created a convincing mosaic of intentional race discrimination; (3) whether he presented sufficient evidence of a "cat's paw" theory of liability; (4) whether Chief Alexander and

---

[3] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

4                    Opinion of the Court                    21-13779

Deputy Chief Miuccio were "final policymakers" whose acts could subject the City to liability under § 1983; (5) whether he sued the individual defendants in their individual capacities; and (6) whether the individual defendants were "decisionmakers" subject to § 1983 liability.

After review, and with the benefit of oral argument, we discern no reversible error in the district court's ruling. Only three issues—Robert's comparators, "cat's paw" theory, and convincing mosaic—warrant further discussion.[4]

Because we write for the parties, who are already familiar with the facts, we set out only so much of the facts as is necessary to understand our opinion.

## I.    COMPARATORS

A Title VII claimant who, like Robert, proceeds without direct evidence may survive summary judgment by relying on

---

[4] We review *de novo* the grant of summary judgment, viewing the facts in the light most favorable to the non-moving party. *Christmas v. Harris Cnty.*, 51 F.4th 1348, 1353 (11th Cir. 2022). To survive summary judgment, Robert must present "enough evidence for a reasonable jury to infer intentional discrimination." *Ossmann v. Meredith Corp.*, 82 F.4th 1007, 1020 (11th Cir. 2023). Because Robert bases his Title VII, FCRA, and § 1983 claims on the same allegedly unlawful employment discrimination, the elements of those claims are identical, and the same methods of proof are used. *See Johnson v. Mia.-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020); *see also Harris v. Pub. Health Tr. of Mia.-Dade Cnty.*, 82 F.4th 1296, 1300 n.2 (11th Cir. 2023) ("Claims under Title VII and the FCRA are analyzed under the same framework.").

circumstantial evidence that satisfies the *McDonnell Douglas* burden-shifting framework. *See Anthony v. Georgia*, 69 F.4th 796, 805 (11th Cir. 2023). Under that framework, Robert bears the initial burden of establishing a prima face case of race discrimination by showing, among other things, the City treated similarly situated white employees—called "comparators"—more favorably. *See id.* To meet his burden, Robert must show that he and his proffered comparators were "similarly situated in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc) (*Lewis I*). Generally, a plaintiff and his comparators are similarly situated if they (1) engaged in the same basic conduct, (2) were subject to the same policies, (3) had the same supervisor, and (4) had the same employment or disciplinary history. *Id.* at 1227-28.

Robert proffered two white probationary officers that were disciplined but not terminated or asked to resign: Derek McQuiston and Travis Rafalko. However, McQuiston and Rafalko were not "similarly situated in all material respects" to Robert. *See id.* at 1224. Crucially, Robert had what McQuiston and Rafalko lacked—a history of repeated paperwork errors.

Throughout his probationary period, Robert established a pattern of struggling to complete timely and correctly his paperwork. We highlight just a few of these instances. Three daily observation reports from September and October 2016 indicated Robert's "least satisfactory" performance was that his reports were

missing relevant details, contained grammatical errors, and were not written in a timely manner.

Sergeant Yvette Vasquez-Bello, Robert's supervisor before Codling, testified that he had issues with report writing, grammar, and turning in reports on time, and that his "paperwork was most of the time incorrect." In February and March 2017, Vasquez-Bello spoke with Robert about having overdue cases and the need to turn in his reports on time, but she felt Robert was not improving.

Additionally, in March and April 2017, a records clerk contacted Robert several times due to his failure to attach to a report a written victim statement and a defendant's sworn statement. And in April and May 2017, Robert was contacted by a records clerk three more times for his failure to submit traffic stop and accident reports.

Finally, supervisor Codling issued Robert a memorandum of counseling for two paperwork errors Robert made in April 2017: (1) Robert was assigned to write an accident report on April 15, 2017, but he did not submit the report until April 19, 2017, and the report contained multiple errors that he did not correct until April 28, 2017; and (2) Robert responded to a domestic battery call and developed probable cause to arrest a suspect, but he failed to sign a probable cause affidavit before leaving at the end of his shift.

There is no evidence McQuiston or Rafalko had similar histories of repeated paperwork errors or a pattern of mistakes of any kind. Instead, McQuiston was disciplined for two incidents: (1) causing a car crash by running a red light; and (2) lying in a

probable cause affidavit. Rafalko was disciplined for losing a suspect's car keys after taking the suspect into custody.

As this Court has explained, the requirement for comparators to be sufficiently similar in all material respects seeks to "balance[] the need to protect employees from invidious discrimination *with the deference owed to employers' rational business judgments*." *Lewis I*, 918 F.3d at 1224-25 (emphasis added). Mindful of these interests, we require comparators to be so similar "that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)). Given Robert's pattern of poor performance with paperwork during his probationary period—and McQuiston's and Rafalko's lack of a similar pattern—they are reasonably distinguished from Robert.

## II.    CAT'S PAW THEORY

To show a non-decisionmaker's animus caused the decisionmaker's termination action, "the plaintiff must prove that the discriminatory animus behind the recommendation, and not the underlying employee misconduct identified in the recommendation, was an actual cause of the other party's decision to terminate the employee." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). One way to do this is through a "cat's paw" theory. *Id.* at 1332 (stating, under such a theory, that the decisionmaker acts "as a mere conduit" or rubberstamp for the recommender's discriminatory animus). To proceed under a "cat's paw" theory, a plaintiff must put forth evidence that the biased non-decisionmaker manipulated the decisionmakers into

terminating him. *Wright v. Southland Corp.*, 187 F.3d 1287, 1304 n.20 (11th Cir. 1999).

The plaintiff's evidence must show a "truly direct" causal link tying the biased non-decisionmaker's animus to the decisionmaker's termination action. *Stimpson*, 186 F.3d at 1331. It is insufficient for a plaintiff to simply show the decisionmaker considered accurate information from a purportedly biased non-decisionmaker about the plaintiff's work misconduct. *See Wright*, 187 F.3d at 1304 n.20.

For example, we held in *Wright* that the plaintiff's evidence did not support a "cat's paw" theory because (1) the non-decisionmaker's "only input into the termination decision was three letters he wrote . . . in which he documented certain problems involving [plaintiff's] accounting procedures," and (2) there was no evidence these letters contained any misinformation. *Id.* Even though the decisionmakers considered the letters in their decision to terminate the plaintiff, we emphasized that the plaintiff "presented no evidence that the accounting problems documented in the letters did not actually exist." *Id.* Consequently, there was "no evidence that [the non-decisionmaker] manipulated the decisionmakers, and thus any discriminatory intent on [the non-decisionmaker's] part could not be said to be the cause of [plaintiff's] termination." *Id.*; *see also Lindsey v. Walgreen Co.*, 615 F.3d 873, 876 (7th Cir. 2010) (holding that plaintiff could not proceed under a "cat's paw" theory because she failed to show the biased non-decisionmaker concealed

information or provided false information to the decisionmaker, and evidence that the non-decisionmaker "uttered offensive slurs . . . d[id] not establish that she manipulated [the decisionmaker's] decision").

On appeal, Robert argues that his supervisor Codling had racial animus, and that this animus can be imputed to Chief Alexander and Deputy Chief Miuccio because they "merely rubber stamped Codling's recommendation to terminate Mr. Robert, as it made its way up the chain of command."  Robert contends there was no independent investigation of his performance because Chief Alexander and Deputy Chief Miuccio testified they did not review Robert's employment file or disciplinary history.

## A.    Facts

Here are the relevant facts in this issue in the light most favorable to Robert.  Codling began supervising Robert at some point after April 19, 2017.  By May 5, 2017, Codling believed the City should consider terminating Robert for his paperwork problems.  Around that time, Codling contacted Robert's three past supervisors, and they confirmed that Robert had performance issues.  Codling then had several meetings with Codling's supervisors, Captain Steven Meyer and Lieutenant Nelson Guillot, to discuss Robert's performance.

On May 8, 2017, Captain Meyer met with Deputy Chief Miuccio to discuss "Robert's poor performance, and repeated errors, and failure to follow departmental procedures."  Captain Meyer stated Lieutenant Guillot approached him with concerns

about Robert. Deputy Chief Miuccio and Captain Meyer did not discuss Codling at this meeting, and Miuccio stated she did not hear "Sergeant Codling's name until well after this" when, on May 31, 2017, she signed Robert's memorandum of counseling. Captain Meyer and Deputy Chief Miuccio spoke again on May 15, 19, and 30, 2017 about "Robert's performance deficiencies and lack of improvement." Captain Meyer stated "he did not feel that Mr. Robert was going to successfully complete his probation," so Deputy Chief Miuccio decided to meet with Chief Alexander.

Deputy Chief Miuccio spoke with Chief Alexander in May 2017. While they did not review Robert's personnel file, they discussed Robert's "performance deficiencies, that they occurred over time, and that they were repeated." Chief Alexander and Deputy Chief Miuccio decided to offer Robert the chance to resign, and if he did not, Chief Alexander would recommend Robert's termination to the City Manager. Codling did not come up during this meeting, and Chief Alexander was unaware Codling supervised Robert until after Robert resigned.

Chief Alexander and Deputy Chief Miuccio then instructed Captain Meyer to meet with Robert and offer him the chance to resign in lieu of Chief Alexander recommending Robert's termination to the City Manager. Unbeknownst to Alexander and Miuccio, Captain Meyer had Codling meet with Robert. During that May 31, 2017 meeting, in which Codling was joined by three other supervisors, Codling presented Robert with the memorandum of counseling and told Robert he could resign in

lieu of termination.  Because Robert resigned, Chief Alexander never recommended Robert's termination to the City Manager.

After Robert resigned, another officer submitted a letter to Chief Alexander asserting Codling made racist comments.  The City launched an investigation, which revealed Codling made several racist jokes in text messages with other officers, used the n-word, and referred to himself as "a racist asshole."  None of these comments were directed at Robert or made in his presence.[5]

## B.    Discussion

Based on the multi-tiered decisionmaking process outlined above, a reasonable jury could not conclude that Deputy Chief Miuccio and Chief Alexander merely rubber-stamped Codling's recommendation that Robert be terminated.  That process included four meetings between Deputy Chief Miuccio and Captain Meyer, and a separate meeting between Deputy Chief Miuccio and Chief Alexander, all of which centered on Robert's undisputed repeated poor performance.  Codling was not present at any of these meetings, and Deputy Chief Miuccio and Chief Alexander testified that they were unaware of Codling's role when they offered Robert the chance to resign in lieu of recommending his termination to the City Manager.

Notably too, the record indicates that Robert actually struggled with timely and correctly completing his paperwork, as

---

[5] The City terminated Codling, but later rehired him at a demoted rank pursuant to a disciplinary settlement and last-chance agreement.

described above. At his deposition, Robert admitted that his reports sometimes contained errors or were missing information, and that Vasquez-Bello spoke with him about his report writing and timely submitting his reports. As to Codling's memorandum of counseling, Robert does not argue on appeal that it contained misinformation. Indeed, Robert acknowledges that this memorandum of counseling "document[ed] two minor paperwork errors" that violated City policy.

Given these facts, a reasonable jury could not conclude Codling manipulated Chief Alexander and Deputy Chief Miuccio to request Robert's resignation. *See Wright*, 187 F.3d at 1304 n.20.

## III.    CONVINCING MOSAIC

A plaintiff who fails to establish a prima facie case under the *McDonnell Douglas* framework nonetheless may survive summary judgment if he presents a convincing mosaic of circumstantial evidence raising a reasonable inference that the employer intentionally discriminated against him. *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*). A convincing mosaic may be made up of evidence demonstrating, among other things, "(1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Id.* (alteration in original and quotation marks omitted).

Here, Robert relies on the following evidence to make his case: (1) Codling's racist comments; (2) the City's failure to follow

its progressive disciplinary policy; (3) the fact that McQuiston and Rafalko were not terminated or asked to resign; and (4) Codling's retroactive documentation of Robert's paperwork errors, which Codling and Robert's prior supervisors had witnessed. However, this circumstantial evidence is insufficient for a reasonable jury to infer intentional race discrimination.

First, Codling's comments, while troubling, were not directed at, or made in the presence of, Robert. Further, Robert did not complain of Codling's racism while employed at the City or in a post-resignation letter he wrote to Chief Alexander. Regardless, (1) as explained above, Robert's evidence is not sufficient for a reasonable jury to impute Codling's racial animus to Deputy Chief Miuccio and Chief Alexander, and (2) Robert testified that he had no reason to think Chief Alexander or Deputy Chief Miuccio—the individuals who decided to request Robert's resignation—were racist toward him.

Second, while the City has what can be described as a progressive disciplinary policy, that policy provides that "[a] situation may arise requiring suspension or termination as the first form of discipline." Due to Robert's repeated pattern of paperwork errors that did not improve over the course of his probationary period, we cannot say that Chief Alexander and Deputy Chief Miuccio's request for his resignation in lieu of seeking his termination from the City Manager violated the City's policy. "We do not sit as a super-personnel department that reexamines an entity's business decisions," "[n]or may we analyze

whether an employer's proffered reasons are prudent or fair." *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (quotation marks omitted), *cert denied*, 143 S. Ct. 2465 (2023).

Third, Robert did not present evidence that similarly situated employees were treated better than he was. A convincing mosaic may include evidence that similarly situated employees were treated differently, even where those employees were not strict comparators at the prima facie stage of a *McDonnell Douglas* analysis. *Jenkins v. Nell*, 26 F.4th 1243, 1250-51 (11th Cir. 2022). Still, we conclude McQuiston and Rafalko were simply too dissimilar. Their one-off performance issues reasonably distinguish them from Robert's repeated paperwork errors.

Finally, Robert asserts that, prior to the City seeking Robert's resignation, Codling gathered past instances of Robert's paperwork errors from Robert's previous supervisors and entered those instances into software used to document employee feedback. Robert argues that Codling's retroactive documentation of Robert's past errors was "pretext to hide the fact that Officer Codling targeted Robert based upon his race."[6] But for reasons

---

[6] For the first time in his reply brief, Robert argues the district court erred in considering his past instances of paperwork errors that Codling retroactively documented because such errors constituted after-acquired evidence. Robert abandoned this issue by failing to raise it in his initial brief on appeal. *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1313 (11th Cir. 2023). Regardless, these instances were known to the City prior to Robert's resignation and cannot be characterized as after-acquired evidence. *See McKennon v. Nashville*

21-13779              Opinion of the Court                 15

already detailed, Codling's racial animus cannot be imputed to the decisionmakers, Chief Alexander and Deputy Chief Miuccio.

### IV.    CONCLUSION

We affirm the district court's grant of summary judgment to the City, Chief Alexander, Deputy Chief Miuccio, and Codling.

**AFFIRMED.**

---

*Banner Publ'g Co.*, 513 U.S. 352, 354, 356 (1995) (stating the after-acquired-evidence doctrine prevents an employer from escaping liability when the employer discovers evidence of wrongdoing *after* the employee's discharge).